**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| The Huntington National Bank | |
| Plaintiff, | |
| v. | Case No. 23-cv-00220 |
| Midwest Heart and Vascular Associates, Inc. a/k/a Midwest Heart and Vascular Associates, S.C. Dominic Tolitano; Anthony Del Priore; The Institute For Cardio Thoracic & Vein Surgery, LLC | Assigned Judge: Magistrate Judge: |
| Defendants. | |

## **COMPLAINT**

NOW COMES Plaintiff, The Huntington National Bank (the "Plaintiff" or "Huntington"), and for its complaint against defendants Midwest Heart and Vascular Associates, Inc., a/k/a Midwest Heart and Vascular Associates, S.C ("Borrower") Dominic Tolitano, Anthony Del Priore, and The Institute For Cardio Thoracic & Vein Surgery, LLC (collectively the "Guarantors") states as follows:

1.      This Court has original subject matter jurisdiction in this lawsuit pursuant to 28 U.S.C. §1332(a), because the matter in controversy is between citizens of different states and it exceeds the sum of $75,000.00, exclusive of interest and costs.

2.      This Court has personal jurisdiction over the defendant under 735 ILCS 5/2-209(a) & (b).

3.      Venue is proper in this district pursuant to 28 U.S.C. §1391.

4.      Plaintiff is a national banking association, the main office of which is located in the State of Ohio and the state designated on its organization certificate is Ohio.

5.      Defendant Midwest Heart and Vascular Associates, Inc. a/k/a Midwest Heart and

Vascular Associates, S.C is incorporated in the state of Illinois and maintains its principal place of business at 236 East Irving Park Rd., Wooddale, Illinois.

6.      The defendant, Dominic Tolitano ("Tolitano"), is a citizen of the State of Illinois, and was at all times referenced in this Complaint, domiciled in LaGrange, Illinois.

7.      The defendant, Anthony Del Priore ("Del Priore"), is a citizen of the State of Illinois, and was at all times referenced in this Complaint, domiciled in Chicago, Illinois.

8.      The defendant, The Institute For Cardio Thoracic & Vein Surgery, LLC, is a limited liability company organized in the State of Illinois. Its sole members are Tolitano and Del Priore.

9.      On or about June 27, 2019, Plaintiff extended credit to Midwest Heart & Vascular Associates, Inc. ("Borrower") in the amount of $350,000.00. As evidence of the Loan, Borrower executed a Promissory Note in favor of Plaintiff dated June 27, 2019, in the principal amount of $350,000.00 (the "First Note").  A true and correct copy of the First Note is attached hereto as Exhibit A and by express reference made a part hereof.

10.     On or about August 22, 2019, Plaintiff extended credit to Borrower in the amount of $51,200.00. As evidence of the Loan, Borrower executed a U.S. Small Business Administration Note in favor of Plaintiff dated August 22, 2019, in the principal amount of $51,200.00 (the "Second Note").  A true and correct copy of the Second Note is attached hereto as Exhibit B and by express reference made a part hereof.

11.     On or about February 16, 2022, Plaintiff, extended credit to Borrower in the amount of $55,045.00. As evidence of the Loan, Borrower executed an Equipment Finance Agreement in favor of Plaintiff dated February 16, 2022, in the principal amount of $55,045.00.

(the "Third Note" and collectively with the First and Second Notes "Notes"). A true and correct copy of the Third Note is attached hereto as <u>Exhibit C</u> and by express reference made a part hereof.

12.     As additional security for the Notes, Guarantors executed certain Commercial Guaranty Agreements (collectively, the "Guarantees") in favor of Plaintiff guarantying payment of all amounts due on the Notes. A true and correct copy of the Guarantees are attached hereto as <u>Exhibits D through G</u>.

13.     Borrower allowed numerous Events of Default ("Events of Default") to occur under the terms of the Notes, including Borrower's failure to pay the monthly principal and interest payments when due. Additionally, Borrower appears to have ceased operating, and filed a chapter 11 bankruptcy on November 11, 2022 in the Northern District of Illinois Bankruptcy Court which bankruptcy was subsequently dismissed on January 12, 2023.

14.     Under the terms of the Notes and Guarantees, Borrower and Guarantors also guaranteed payment of any attorney's fees and cost incurred by Plaintiff in enforcing its rights under the Note.

## COUNT I – BREACH OF NOTES

15.     Plaintiff adopts and realleges the allegations in paragraphs 1 through 14 as paragraph 15 of this Count I.

16.     By reason of the foregoing, as of November 11, 2022, Borrower is indebted to the Plaintiff in the amount of $402,459.67 for the amounts due on the three Notes consisting of $350,095.38 due on the First Note, $2,543.19 due on the Second Note, and $49,821.10 due on the Third Note.

WHEREFORE Plaintiff requests this Court enter judgment in its favor and against Midwest Heart and Vascular Associates, Inc. a/k/a Midwest Heart and Vascular Associates, S.C in the amount of $402,459.67 and grant such further relief to which Plaintiff is entitled.

## COUNT II – BREACH OF GUARANTY TOLITANO

17. Plaintiff adopts and realleges the allegations in paragraphs 1 through 16 as paragraph 17 of this Count II.

18. By reason of the foregoing, as of November 11, 2022, Dominic Tolitano is indebted to the Plaintiff in the amount of $402,459.67 for the amounts due on the three Notes consisting of $350,095.38 due on the First Note, $2,543.19 due on the Second Note, and $49,821.10 due on the Third Note.

WHEREFORE Plaintiff requests this Court enter judgment in its favor and against Dominic Tolitano in the amount of $402,459.67 and grant such further relief to which Plaintiff is entitled.

## COUNT III – BREACH OF GUARANTY DEL PRIORE

19. Plaintiff adopts and realleges the allegations in paragraphs 1 through 18 as paragraph 19 of this Count III.

20. By reason of the foregoing, as of November 11, 2022, Anthony Del Priore is indebted to the Plaintiff in the amount of $402,459.67 for the amounts due on the three Notes consisting of $350,095.38 due on the First Note, $2,543.19 due on the Second Note, and $49,821.10 due on the Third Note.

WHEREFORE Plaintiff requests this Court enter judgment in its favor and against Anthony Del Priore in the amount of $402,459.67 and grant such further relief to which

Plaintiff is entitled.

### COUNT IV – BREACH OF GUARANTY
### THE INSTITUTE FOR CARDIO THORACIC & VEIN SURGERY, LLC

21.     Plaintiff adopts and realleges the allegations in paragraphs 1 through 20 as paragraph 21 of this Count IV.

22.     By reason of the foregoing, as of November 11, 2022, The Institute for Cardio Thoracic & Vein Surgery, LLC is indebted to the Plaintiff in the amount of $402,459.67 for the amounts due on the three Notes consisting of $350,095.38 due on the First Note, $2,543.19 due on the Second Note, and $49,821.10 due on the Third Note.

WHEREFORE Plaintiff requests this Court enter judgment in its favor and against Cardio Thoracic & Vein Surgery, LLC in the amount of $402,459.67 and grant such further relief to which Plaintiff is entitled.

THE HUNTINGTON NATIONAL BANK

By: /s/ Matthew L. Hendricksen
    One of its Attorneys

Matthew L. Hendricksen (6296720)
Plunkett Cooney, P.C.
221 N. LaSalle Street, Suite 3500
Chicago, Illinois 60601
(312) 970-3495
mhendricksen@plunkettcooney.com

Open.26611.24712.30343679-1

# EXHIBIT A

# PROMISSORY NOTE

| Principal $350,000.00 | Loan Date 06-27-2019 | Maturity 07-05-2024 | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Midwest Heart & Vascular Associates, Inc.
236 E Irving Park Rd
Wood Dale, IL 60191

**Lender:** THE HUNTINGTON NATIONAL BANK
Chicago Commercial Lending
501 West North Avenue
Melrose Park, IL 60160

---

**Principal Amount: $350,000.00**     **Initial Rate: 7.500%**     **Date of Note: June 27, 2019**

**PROMISE TO PAY.** Midwest Heart & Vascular Associates, Inc. ("Borrower") promises to pay to THE HUNTINGTON NATIONAL BANK ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Fifty Thousand & 00/100 Dollars ($350,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 5, 2024. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 5, 2019, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**RATE ADJUSTMENT.** The interest rate will be adjusted every calendar month (the "change period") beginning August 01, 2019 (date of first rate adjustment).

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.500% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, resulting in an initial rate of 7.500% per annum. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (366 during leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: The Huntington National Bank, GW1W34, 5555 Cleveland Avenue Columbus, OH 43231.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 3.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Illinois.

## PROMISSORY NOTE
### (Continued)

**CONFESSION OF JUDGMENT.** Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $15.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**FINANCIAL STATEMENTS.** Borrower agrees to furnish from time to time on the request of the Lender true and complete financial statements and such other information as the Lender may reasonably require.

**IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth, and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identifying documents for the entity or person.

**ADDITIONAL DEFAULT.** In addition to those events described as Events of Default in the Section of this Note captioned DEFAULT, it shall constitute an Event of Default under this Note if Borrower fails to comply with or to perform any term, obligation, covenant or condition contained in any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement between Borrower and Lender.

**DEPOSIT ACCOUNT.** Borrower shall maintain primary operating deposit accounts with Lender.

**JURISDICTION.** Borrower hereby submits to the jurisdiction of federal and state courts in the state referenced in the "GOVERNING LAW" paragraph of this Note, and waives any objection to venue with respect to actions brought in such courts.

**BUSINESS PURPOSE.** The loan evidenced by this Note is for commercial or business purposes and is not intended to be, and will not be, used for personal, family, household, or educational purposes.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ILLINOIS INSURANCE NOTICE.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THIS NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

MIDWEST HEART & VASCULAR ASSOCIATES, INC.

By: _____
Anthony Del Priore, Secretary of Midwest Heart & Vascular Associates, Inc.

By: _____
Dominic Tolitano, President of Midwest Heart & Vascular Associates, Inc.

# EXHIBIT B



U.S. Small Business Administration

# NOTE

| SBA Loan # | ███████ |
|---|---|
| SBA Loan Name | The Institute for CardioThoracic & Vein Surgery, LLC |
| Date | August 22, 2019 |
| Loan Amount | $51,200.00 |
| Interest Rate | WSJP Quarterly Adjusting + 2.75% |
| Borrower | Midwest Heart and Vascular Associates, Inc. |
| Operating Company | The Institute for Cardio Thoracic & Vein Surgery, LLC |
| Lender | The Huntington National Bank |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

_____ Fifty One Thousand Two Hundred and 00/100 _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3.   PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 8.25% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.75%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $1,044.55 every month, beginning two months from the month this Note is dated; payments must be made on the fifth calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted quarterly (the "change period") beginning October 01, 2019 (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the WSJ Prime newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.75% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:
Notwithstanding any provision in this Note to the contrary:
Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

All remaining principal and accrued interest is due and payable 5 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4.  DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A.  Fails to do anything required by this Note and other Loan Documents;
B.  Defaults on any other loan with Lender;
C.  Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G.  Fails to pay any taxes when due;
H.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I.  Has a receiver or liquidator appointed for any part of their business or property;
J.  Makes an assignment for the benefit of creditors;
K.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M.  Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.


5.  LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.  Require immediate payment of all amounts owing under this Note;
B.  Collect all amounts owing from any Borrower or Guarantor;
C.  File suit and obtain judgment;
D.  Take possession of any Collateral; or
E.  Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.


6.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C.  Release anyone obligated to pay this Note;
D.  Compromise, release, renew, extend or substitute any of the Collateral; and
E.  Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10.  STATE-SPECIFIC PROVISIONS:

IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT

To help the government fight the funding of terrorism and money laundering activities, Federal Law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identify documents for the entity or person.

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Midwest Heart and Vascular Associates Inc

_____
Dominic Tolitano - President
Date: August 22, 2019

_____
Anthony Del Priore - Vice President
Date: August 22, 2019

# EXHIBIT C



# Equipment Finance Agreement

| "EFA": Equipment Finance Agreement Number ▇▇▇▇▇▇▇▇ dated **February 15, 2022** | | | | | |
|---|---|---|---|---|---|
| "Debtor": **Midwest Heart and Vascular Associates, S.C., 236 East Irving Park Road, Wood Dale, IL  60191** | | | | | |
| Fax:                      E-mail: **dtolitano82@gmail.com** | | | | | |
| Business Type: **Corporation** | | | State of Organization: **Illinois** | | |
| "Creditor": **The Huntington National Bank, 1405 Xenium Lane North (PCC180), Plymouth, MN 55441** | | | | | |
| Fax:**(800) 844-3577** | | E-mail: **EFCustomerService@huntington.com** | | | |

**SUMMARY OF TERM AND PAYMENTS:**

| Funding Date | Financed Amount | Number of Payments | Payment Amount | Document Fee | Advance Payment(s) |
|---|---|---|---|---|---|
|  | **$55,045.00** | **60** | **$1,053.71** | **$395.00** | **N/A** |
|  |  |  |  | Security Deposit **N/A** | For Number of Month(s): **N/A** |

**DESCRIPTION AND LOCATION OF EQUIPMENT, PERSONAL PROPERTY, SERVICES AND/OR SOFTWARE:**

| **Description: Two (2) Biolitec E30 Watt 980nm Lasers, Serial #0101 and 0102 together with all attachments and accessories thereto** | **Location: 236 East Irving Park Road, Wood Dale, IL 60191** |
|---|---|
| **Mileage, if applicable: _____** | |

1.  **Financing.**  Debtor has requested that Creditor provide financing to enable Debtor to purchase the equipment, personal property, services and/or software described above and/or on any exhibit hereto (together with all accessories, attachments, parts, replacements, repairs and additions thereto and all proceeds of the foregoing, collectively the "Collateral"). Upon Creditor's acceptance and execution of this EFA, receipt of any amounts due upon signing of this EFA, receipt of other documentation required by Creditor and confirmation that the Collateral has been delivered to and accepted by Debtor, Creditor agrees to finance the purchase of the Collateral on the terms set forth in this EFA, including all of Debtor's obligations, covenants and agreements hereunder. Upon satisfaction of all conditions to funding, Creditor will pay the Financed Amount, as adjusted in accordance with Section 2 below, directly to the vendor(s) of the Collateral. Debtor authorizes Creditor to complete the Funding Date set forth above based on the date of actual funding.

2.  **Payments.**  In consideration of the financing provided by Creditor, Debtor agrees to pay to Creditor the Financed Amount, together with interest thereon, by paying to Creditor each of the following amounts when specified: (a) the amount of any Advance Payment(s) set forth above, due and payable on the date Debtor delivers this EFA, and (b) consecutive monthly installments each equal to the Payment Amount set forth above for the Number of Payments set forth above less the number of Advance Payments made upon delivery of this EFA, with such consecutive monthly Payments beginning on the date that is one month after the Funding Date and then on the same day of each calendar month thereafter. Debtor also agrees to pay to Creditor on the date Debtor delivers this EFA the amount of any Security Deposit and Document Fee set forth above. If, for any reason, the final amount that Creditor finances (all amounts Creditor pays in connection with the purchase, delivery and installation of the Collateral, including any trade-up and buy out amounts, and any amounts financed, before application of any subsidies or like amounts) is more or less than the Financed Amount set forth above (which is based on an estimate), the Payment Amount will be adjusted to provide Creditor the same yield it would have obtained if the final amount financed had been equal to the Financed Amount set forth above. Debtor agrees that this EFA will be amended to reflect the adjusted Financed Amount and Payment Amount, and the adjusted Advance Payment(s) and Security Deposit, if applicable, by (i) written notice from Creditor to Debtor for adjustments of 10% or less; or (ii) signed Amendment. In the event that Creditor applies any portion of the Security Deposit to Obligations hereunder, Debtor shall pay to Creditor on demand the amount necessary to restore the full amount of the Security Deposit set forth above. If any amount payable hereunder is not paid within ten (10) days of its due date, Creditor may impose a late fee of up to 10% of the amount of the past due payment and may, in addition, charge interest on the unpaid amount at eighteen percent (18%) per annum or, if less, the maximum rate permitted by applicable law. Creditor may apply payments hereunder and any Security Deposit to Debtor's Obligations hereunder in such order as it deems appropriate and will return any unapplied balance to Debtor, without interest, when all Obligations are satisfied. Debtor may from time to time make telephonic requests for, and hereby authorizes, Creditor or its agents to make and draw checks or drafts on a checking account to be designated by Debtor, payable to Creditor or order, to pay amounts due hereunder, plus Creditor's standard per item fee for making and drawing such check or draft. Creditor may rely on such request made by any person it believes has authority to make such request on behalf of Debtor. Debtor will pay Creditor a fee, in an amount determined by Creditor, not to exceed the maximum amount from time to time permitted by applicable law on demand for any check or automatic payment request returned due to insufficient funds or stop payment. This EFA shall be construed so that interest, the applicable interest rate, fees and other charges shall not exceed the maximum time price differential, rate, interest or amount allowed by applicable law, and any excess payment will be applied first to prepay principal hereunder and then as a refund to Debtor. If Debtor is an individual and the Financed Amount is $100,000 or more, this EFA is made under Minn. Stat. Sec. 334.01; this EFA is made under Minn. Stat. Sec. 334.022 if Debtor is an "organization" as defined therein.

3. **Prepayment.**  Debtor may not prepay this EFA or any of the Payments due hereunder.

4.  **Security Interest.**  Debtor grants Creditor a security interest in the Collateral (the "Security Interest") to secure all its obligations under this EFA and all other indebtedness and obligations of Debtor to Creditor, of whatever type or description, now or hereafter arising (together, the "Obligations"). Debtor authorizes Creditor to file such financing statements, title certificates and instruments as Creditor deems necessary to perfect and protect the Security Interest, without Debtor's signature, and, if such signature is needed, Debtor appoints Creditor as Debtor's attorney-in-fact to sign such items in Debtor's name. Debtor further authorizes Creditor to add to or change the Collateral description for the purpose of completing or correcting any serial numbers or other specific identification when known.

5.  **Representations and Warranties.**  Debtor represents and warrants that (a) Debtor is the type of entity set forth above and, if a legal entity, is duly organized, validly existing and in good standing under the laws of the state set forth above; (b) Debtor's exact legal name is as shown above, and: (i) if Debtor is an individual, such legal name is exactly as stated on Debtor's valid and unexpired state driver's license, or alternative state identification, issued by Debtor's primary state of residence ("Debtor State ID"); or (ii) if Debtor is a legal entity, such legal name is as stated on Debtor's applicable organizational documents; (c) its execution, delivery and performance of this EFA will not violate or create a default under any law, regulation, order, agreement or charter document binding on Debtor or its property; (d) this EFA has been duly authorized, executed, and delivered by Debtor; (e) Debtor's signatory of this EFA has the authority to bind Debtor to this EFA; (f) Debtor, if an individual, is a citizen or lawful permanent resident of the United States; (g) the Collateral will be used solely for business purposes and not for personal, family or household purposes; (h) the Collateral is and shall remain located (or, in the case of titled motor vehicles, garaged) at the Location set forth above over which Location is owned or leased by Debtor; (i) at the time that Debtor requests Creditor to fund any portion of the Financed Amount, the Collateral shall have been delivered to the Location and shall have been fully installed, if applicable, shall be in good working order, Debtor shall have irrevocably accepted the Collateral and Debtor shall have good and marketable title to the Collateral, free and clear of any liens, claims, security interests or rights, other than the Security Interest; and (j) if Debtor is a legal entity, Debtor shall not allow any Blocked Person(s) to have an ownership interest in or control of Debtor.  "Blocked Person" means any person or entity (A) that is now or at any time on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list; (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government, or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Creditor, to be a person with whom Creditor is not permitted to extend credit to or with regard to whom, a debtor-creditor relationship may result in penalties against Debtor or Creditor or limitations on Creditor's ability to enforce a transaction.

6. **Covenants.** Debtor shall maintain the Collateral in good repair, condition and working order, ordinary wear and tear excepted, and shall furnish all needed parts, services, tires, gasoline, oil, grease and other items required to operate the Collateral and make all modifications and improvements required by law. The Collateral shall be operated in a safe and reasonable manner so as to prevent loss or damage to the Collateral or other property and injury to third parties. Debtor shall be responsible for the cost of delivery, installation, operation and maintenance of the Collateral. Debtor also is responsible for any loss, theft or destruction of, or damage to, the Collateral from any cause at all (collectively "Loss"), whether or not insured, and no Loss shall relieve Debtor of its Obligations hereunder. Debtor shall promptly notify Creditor in writing of any Loss to the Collateral and shall promptly repair or replace any Collateral after a Loss. Debtor shall comply with all applicable laws and regulations related to the Collateral and its use. Creditor is financing Debtor's purchase of the Collateral and, notwithstanding anything contained in this EFA to the contrary, Debtor and Creditor hereby agree and acknowledge that Debtor owns and holds legal title to the Collateral and, pursuant to Section 4 of this EFA, Debtor grants to Creditor the Security Interest in the Collateral. Debtor represents, warrants and agrees with and to Creditor that Debtor shall not sell, transfer, lease, grant a security interest in, or otherwise encumber the Collateral, and will at all times own and hold good legal title to the Collateral. Debtor shall not permit or suffer the Collateral to have imposed, and shall bear the cost of keeping the Collateral free from or removing, any lien, claim or encumbrance, except for the valid, perfected and enforceable first priority Security Interest in the Collateral and proceeds thereof, that Creditor will at all times hold, subject to no other security interest, mortgage, lien or encumbrance. Debtor shall permit Creditor to inspect the Collateral and Debtor's records related thereto at any time during business hours. Debtor shall pay when due all property, sales, use, excise and other taxes now or hereafter levied on or assessed against the Collateral or this transaction. Debtor shall not change its legal name or state of organization (if a legal entity) or legal name or principal residence (if an individual), and will not permit its Debtor State ID to expire, become invalid, or fail to be properly renewed, (if an individual) without, in each case, at least 30 days' prior written notice to Creditor of any such event. During this EFA, upon the request of Creditor, Debtor will provide copies of its Debtor State ID (if an individual) or applicable organizational documents (if a legal entity), and Debtor will execute and deliver to Creditor such other documents and provide such information, including information identifying the owners of Debtor and its affiliates and their respective ownership interests, as Creditor may reasonably deem necessary to comply with laws or regulations applicable to Debtor or Creditor, including laws and regulations requiring Creditor to obtain Debtor's certification of its beneficial owner(s) prior to making payment(s) to Debtor during or after the term of this EFA. Debtor will, at its sole expense, before operating the Collateral, obtain all titles, registrations, registration plates, permits and licenses, including renewals, required for the lawful ownership, use and operation of the Collateral. If the Collateral is subject to any certificate of title or registration statute, Debtor will, at its sole cost and expense, cause the Collateral to be titled in Debtor's name as owner, with Creditor's lien noted thereon, furnish all certificates of title, lien registration notices and related documentation to Creditor, and retain all certificates of registration (and if legally required, a copy of this EFA) in the Collateral. If within 10 days of Debtor's receipt of any Collateral subject to any certificate of title or registration statute, Debtor has not properly titled the Collateral and provided Creditor with such evidence thereof as Creditor shall require, Creditor, in its discretion and in addition to all other remedies hereunder, may charge Debtor late titling fees in the amount of $25, payable at the end of such 10-day period, and $25 for and payable at the end of each 30-day period thereafter until Creditor has received all required evidence of proper titling for all Collateral hereunder.

7. **Insurance.** Debtor will obtain and maintain physical damage insurance issued by responsible insurance companies acceptable to Creditor, insuring the Collateral against damage and loss by theft, fire, collision, and such other risks as are usually carried by owners of similar properties or as may be requested by Creditor, in such amounts and payable in such manner as Creditor shall request (including naming Creditor and assigns as loss payee), and in any event in an amount no less than the greater of the outstanding Financed Amount or the full replacement value of the Collateral, and will furnish evidence of such insurance to Creditor upon request. Each such policy shall contain a clause requiring the insurer to give Creditor at least 30 days' prior written notice of any alteration in the terms of the policy or the cancellation thereof, and a clause specifying that no act or misrepresentation by Debtor shall invalidate such policy against Creditor. Creditor may apply the proceeds of such insurance toward payment of the Obligations, whether or not due, in such order as Creditor shall determine. If Debtor defaults, Debtor hereby appoints Creditor as Debtor's attorney-in-fact to make claim for, receive payment of, and execute and endorse all documents, checks or drafts for loss or damage under any such physical damage insurance policy. In the event Debtor fails to procure, maintain, pay for or provide Creditor with evidence of the insurance required hereby, Creditor shall have the right, but not be obligated, to obtain insurance covering Creditor's interest in the Collateral from an insurer of Creditor's choice. In that event, Debtor shall reimburse Creditor on demand for the cost thereof, including Creditor's fees for services in placing and maintaining such insurance, together with interest until paid at the implicit interest rate for this EFA, as conclusively determined pursuant to the books and records of Creditor and calculated on the basis of a year of twelve 30-day months, and the amount thereof shall be secured by the Security Interest. At Creditor's discretion, Creditor may add all costs of acquiring and maintaining any insurance provided for herein, including without limitation all premiums therefor and all premium finance charges, documentation fees, tracking fees and all other fees and charges incurred by Creditor in connection therewith, plus fees for Creditor's services in placing and maintaining such insurance (all such premiums, costs, fees and charges are referred to herein, collectively, as the "Insurance Charge"), to the amounts due hereunder. Debtor will pay the Insurance Charge, together with interest thereon as set forth above, in equal installments allocated to the remaining Payments due hereunder. NOTHING IN THIS AGREEMENT WILL CREATE AN INSURANCE RELATIONSHIP OF ANY TYPE BETWEEN CREDITOR AND ANY OTHER PERSON.

8. **Indemnity.** Debtor shall indemnify and hold harmless Creditor, its successors and assigns, employees, officers, directors and agents from and against any and all claims or suits for any loss, damage or injury sustained by any person whatsoever by reason of the sale, financing, use, possession or disposition of the Collateral and, in this connection, Debtor shall pay the costs of all reasonable legal fees and all other reasonable expenses incurred by Creditor, its successors and assigns.

9. **Financial Statements.** All financial statements that Debtor has delivered to Creditor fairly present the financial condition of Debtor as of the date thereof and the results of Debtor's operations and cash flows for the periods then ended, all in accordance with generally accepted accounting principles consistently applied. Since the end of the latest fiscal quarter of Debtor, there has been no material adverse change in Debtor's financial condition, operations or cash flows. If required by Creditor, Debtor shall furnish Creditor, as soon as available, but in any event no later than the date required by Creditor after the end of each fiscal year of Debtor, a copy of the balance sheet of Debtor as at the end of such year and the related statements of operations and cash flows, and such other financial information as Creditor may from time to time request. Debtor warrants and represents that all such financial statements shall be complete and correct in all material respects and be prepared in reasonable detail and in accordance with generally accepted accounting principles applied consistently throughout the periods reflected therein.

10. **Events of Default.** Each of the following is an "Event of Default" hereunder: (a) Debtor fails to pay any Payment or other amount due hereunder when due; (b) Debtor fails to comply with any other covenant or agreement hereunder and such failure continues for 10 days after notice by Creditor; (c) any representation or warranty by Debtor set forth in or made in connection with this EFA shall prove materially false or misleading (d) Debtor defaults under any other Obligation to Creditor; (e) Debtor or any guarantor of this EFA ("Guarantor"), or any partner of Debtor ("Partner") if Debtor is a partnership, ceases doing business as a going concern or makes an assignment for the benefit of creditors; (f) Debtor or any Guarantor or Partner admits in writing an inability to pay debts as they come due, voluntarily files or has filed against it involuntarily a petition under the federal Bankruptcy Code or any other present or future federal or state bankruptcy or insolvency law, or a trustee, receiver or liquidator is appointed for it or for all or a substantial part of its assets; (g) any individual Debtor, Guarantor or Partner dies; (h) any material indebtedness of Debtor or any Guarantor is accelerated or payment in full thereof is demanded; (i) Debtor or any Guarantor shall divide or shall consolidate with, merge into or transfer all or substantially all its assets to another entity or individual; or (j) Debtor fails to occupy the premises where any Collateral (other than titled motor vehicles) is located, or the mortgagee or owner of such premises asserts the right to take possession thereof or exercise eviction or other remedies under the mortgage or lease of such premises.

11. **Remedies.** Upon the occurrence of an Event of Default, and at any time thereafter until the same is cured or waived to the written satisfaction of Creditor, Creditor may, in its sole discretion, exercise any one or more of the following rights and remedies: (a) declare immediately due and payable and recover from Debtor, as liquidated damages and not as a penalty, the entire outstanding unamortized Financed Amount, plus all accrued and unpaid interest and any late charges, fees and other unpaid amounts owing under this EFA, as conclusively determined pursuant to the books and records of Creditor, plus a fee equal to 5% of the unamortized Financed Amount, and the same shall thereupon be and become immediately due and payable in full without presentment, notice of dishonor, or protest, all of which Debtor hereby waives; (b) charge interest on the unpaid amount of liquidated damages due hereunder at eighteen percent (18%) per annum, but in no event greater than the maximum rate permitted under applicable law, and all interest accrued hereunder shall be due and payable on demand by Creditor; (c) exercise any and all of the rights and remedies available to a secured creditor under the Uniform Commercial Code as in effect in the State of Minnesota, and in connection therewith, Debtor agrees at its expense to assemble the Collateral and make it available to Creditor at a place or places to be designated by Creditor in the continental United States, and agrees that any notice of intended disposition of the Collateral required by law shall be deemed reasonable if such notice is given to Debtor in the manner provided in this EFA

before the date of such disposition; (d) recover from Debtor, and Debtor agrees to pay, all costs and expenses incurred by Creditor in the exercise of any right or remedy available to it under this EFA, including expenses of repossession, repair, storage, transportation, and disposition of the Collateral, costs of obtaining money damages and attorneys' fees and expenses for any purpose related to this EFA, including consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or arbitration; (e) exercise any and all other rights and remedies available to it by law or in equity or by any other agreement. Debtor grants to Creditor the right to enter into or on any premises where Collateral may be located for the purpose of repossessing Collateral upon the occurrence of an Event of Default hereunder. Creditor has no obligation to clean up or otherwise prepare or process the Collateral for sale or other disposition. Creditor may do any of the following in connection with a disposition of the Collateral without adversely affecting the commercial reasonableness thereof: (i) comply with any applicable state or federal law requirements; and (ii) refrain from giving and specifically disclaim any and all warranties, including without limitation warranties of title, quality, condition, merchantability, fitness or otherwise. If Creditor sells any of the Collateral on credit, or leases any of the Collateral, Debtor will be credited only with payments actually received by Creditor and applied to the indebtedness of such purchaser or lessee and in the event such purchaser or lessee defaults in its obligation to pay for the Collateral, Creditor may resell or otherwise dispose of the Collateral and Debtor shall be credited with the proceeds of that sale or other disposition. No remedy permitted hereunder shall be exclusive and all remedies shall be cumulative but only to the extent necessary to recover amounts for which Debtor is liable hereunder.

12. **Assignment.** Without Creditor's prior written consent, Debtor will not sell, assign, transfer (via merger, division, or otherwise), sublet, pledge or otherwise encumber or permit a lien arising through Debtor to exist against any interest in this EFA or the Collateral. Creditor may assign or grant a security interest in its interest in this EFA and in all or any part of the Collateral without notice to or consent of Debtor, and Debtor agrees not to assert against any assignee any claim or defense Debtor may have against Creditor or any other party. Any assignee of Creditor shall have all the rights, but none of the obligations, of Creditor under this EFA.

13. **Non-Cancelable, Unconditional Obligation, Disclaimer.** This EFA cannot be canceled or terminated except as expressly provided herein. All representations, warranties and indemnities of Debtor made or agreed to in or in connection with this EFA shall survive expiration or termination of this EFA. Debtor agrees that its obligations to pay amounts due under this EFA are absolute and unconditional and shall not be subject to any defenses, setoffs, abatement, reduction or counterclaims of any kind regardless of whether or not (a) any vendor or manufacturer (including Creditor) has breached any of its warranties or other covenants relating to the Collateral, or (b) any maintenance, support or other services provided in connection with the Collateral has been breached, revoked or otherwise terminated for any reason whatsoever. Except for any express warranty provided by Creditor in its capacity as manufacturer or vendor of any of the Collateral (which warranties are separate and distinct from this EFA), CREDITOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE COLLATERAL INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY. ANY WARRANTY OR RELATED CLAIM THAT DEBTOR MAY ASSERT AGAINST CREDITOR IN ITS CAPACITY AS MANUFACTURER OR VENDOR OF ANY OF THE COLLATERAL SHALL BE SEPARATE AND DISTINCT FROM DEBTOR'S OBLIGATIONS UNDER THIS AGREEMENT, AND DEBTOR MAY NOT ASSERT ANY SUCH CLAIM AS A DEFENSE TO THE ENFORCEMENT OF CREDITOR'S RIGHTS UNDER THIS AGREEMENT.

14. **GOVERNING LAW; JURY TRIAL WAIVER.** THIS EFA, AND ALL MATTERS ARISING FROM THIS EFA, INCLUDING ALL INTEREST AND FINANCE CHARGES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW AND, TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, BY THE LAWS OF THE STATE OF MINNESOTA (EXCLUDING CONFLICTS LAWS). DEBTOR HEREBY CONSENTS TO JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS SITTING IN THE STATE OF

MINNESOTA FOR RESOLUTION OF ALL DISPUTES OF ANY NATURE WHATSOEVER REGARDING THIS EFA OR ANY TRANSACTION CONTEMPLATED HEREBY. DEBTOR AGREES THAT, AT CREDITOR'S SOLE ELECTION AND DETERMINATION, CREDITOR MAY SELECT AN ALTERNATIVE FORUM, INCLUDING ARBITRATION OR MEDIATION, TO ADJUDICATE ANY DISPUTE ARISING OUT OF THIS EFA. THE PARTIES HERETO, AFTER CONSULTING (OR HAVING HAD AN OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, INCLUDING ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY RELATED AGREEMENTS.

15. **Miscellaneous.** This EFA constitutes the entire agreement between Debtor and Creditor with respect to the subject matter hereof, and there is no other oral or written agreement or understanding. This EFA may not be amended or modified except by a writing signed by the parties. In Creditor's sole discretion, this EFA and certain documents related to or required in connection with this EFA may be electronically copied and/or delivered by telecopier or other electronic means of transmission ("e-copy") and the e-copy of any such document shall be deemed an original and admissible as such in any court or other proceeding. Without limiting the foregoing, Debtor will send Creditor, on request, any document bearing Debtor's original "wet ink" signature; provided that neither delivery nor failure to deliver the document bearing Debtor's original signature shall limit or modify the agreements set forth above. Debtor consents to the use of electronic signatures, represents and warrants that its electronic signature on this EFA or any related document shall be unconditionally valid and legally enforceable, and agrees not to contest or otherwise challenge the validity or enforceability of any electronic signature or raise any of the foregoing as a defense or counterclaim. There shall be only one original of this EFA, and it shall bear the original ink or electronic signature of Creditor and be marked "Original." To the extent this EFA is "chattel paper", a security or ownership interest may only be created herein by transfer of such originally signed counterpart; provided that, if the "Paper Out" process shall have occurred, then the "Paper Out" version bearing the legend "Original" shall constitute the sole chattel paper original. No delay or omission on the part of Creditor in exercising any right hereunder shall operate as a waiver of such right or of any other right under this EFA or under any other document or instrument executed or delivered in connection with this EFA. Debtor shall pay, on demand, Creditor's costs, fees and expenses incurred in connection with this EFA, any amendment, waiver, release or termination of this EFA or any related document, financing statement, title certificate or instrument, including but not limited to filing and recording fees. This EFA is binding on and inures to the benefit of the parties hereto, their permitted successors and assigns. Any written notice hereunder shall be deemed given when delivered personally, deposited with a nationally recognized overnight courier (with all fees pre-paid), delivered via facsimile or e-mail (with confirmation of transmission), or deposited in the United States mails, certified or registered mail, addressed to recipient at its address set forth above or such other address as may be substituted therefor by notice given pursuant to the terms hereof. Debtor hereby agrees that Creditor, including its vendors, service providers, partners, affiliates successors and assigns, may contact Debtor at any telephone number provided to Creditor, by placing voice telephone calls (including use of automatic telephone dialing systems or prerecorded voice messaging) or, in the case of wireless telephones or other wireless devices, by sending e-mail or automated (SMS) text messages. If more than one Debtor is named herein, the obligations of each shall be joint and several. Debtor authorizes, and represents that all Debtor's principals have authorized, Creditor to obtain such credit bureau reports and make such other credit inquiries with respect to Debtor and such principals as Creditor deems appropriate throughout the term of this EFA; on written request, Creditor will identify any reporting agency used for such reports. Under federal law, Creditor must obtain, verify and record identifying information for each person opening an account. Creditor will ask for Debtor's name, address, date of birth and other identifying information. Creditor may also ask for Debtor's driver's license or other identifying documents.

| | | | | |
|---|---|---|---|---|
| Creditor: | The Huntington National Bank | By: _____ | Title: _____ | |
| Debtor: | Midwest Heart and Vascular Associates, S.C. | By: _____ | Dominic J. Tolitano, President | |

DocuSign Envelope ID: AE29AF33-884C-468B-9512-45F5364E6B21



**PREPAYMENT ADDENDUM TO
EQUIPMENT FINANCE AGREEMENT**

| | |
|---|---|
| The "EFA": Contract Number ███████████ Dated February 15, 2022 | |
| "Debtor" | |
| Midwest Heart and Vascular Associates, S.C., 236 East Irving Park Road, Wood Dale, IL 60191 | |
| "Creditor" | |
| The Huntington National Bank, 1405 Xenium Lane North (PCC180), Plymouth, MN 55441 | |

This Addendum is attached to and made a part of the above-referenced EFA between Debtor and Creditor. Any capitalized terms used but not defined in this Addendum shall have the meanings assigned in the EFA. All terms and conditions of the EFA shall remain in full force and effect except to the extent modified by this Addendum.

(1)  Notwithstanding anything in the EFA to the contrary, Debtor may voluntarily prepay the EFA in full, but not in part, at any time following the one year anniversary after the Funding Date, provided no Event of Default, or event which with the giving of notice, the passage of time or both would constitute an Event of Default, has occurred and is then continuing under the EFA, by paying to Creditor, in immediately available funds, the following "Aggregate Prepayment Amount":

    (i)  all amounts then due and payable under the EFA including all payments, taxes, charges, fees and expenses then due under the EFA, <u>plus</u>

    (ii)  all payments for the balance of the term of the EFA not yet due at the time of such prepayment, discounted from the respective dates such payments would be due (the "Discounted Future Amounts") at the implicit rate of the EFA, which Creditor shall determine using its internal pricing system based on the terms of the EFA, <u>plus</u>

    (iii) a prepayment fee equal to
4% of the Discounted Future Amounts if the effective date of such prepayment occurs after the first (1st) anniversary of the Funding Date but on or before the second (2nd) anniversary of the Funding Date, 3% of the Discounted Future Amounts if the effective date of such prepayment occurs after the second (2nd) anniversary of the Funding Date but on or before the third (3rd) anniversary of the Funding Date, 2% of the Discounted Future Amounts if the effective date of such prepayment occurs after the third (3rd) anniversary of the Funding Date but on or before the fourth (4th) anniversary of the Funding Date, or 1% of the Discounted Future Amounts if the effective date of such prepayment occurs after the fourth (4th) anniversary of the Funding Date but on or before the final Payment due date.

(2)  Following Creditor's receipt of the Aggregate Prepayment Amount from Debtor, and all other amounts secured by Creditor's security interest in the Collateral, including all sales and use taxes (if applicable), Creditor's security interest in the Collateral shall be deemed satisfied and, upon request by Debtor, Creditor will deliver to Debtor such lien releases, certificates and amendments to UCC financing statements as Creditor deems necessary to reflect the satisfaction of Creditor's security interest in the Collateral.

(3)  Debtor agrees to pay all sales and use taxes arising on account of any transfer of the Collateral pursuant to this Addendum.

**Dated as of:  <u>February 15, 2022</u>**

Debtor:   Midwest Heart and Vascular Associates, S.C.      By: _____      Dominic J. Tolitano, President



**Pay Proceeds, Pre-Delivery Acceptance and
Payment Commencement Confirmation**

| | |
|---|---|
| The "EFA": Equipment Finance Agreement No ███████ dated **February 15, 2022** | |
| "Debtor" | |
| **Midwest Heart and Vascular Associates, S.C., 236 East Irving Park Road, Wood Dale, IL  60191** | |
| "Creditor" | |
| **The Huntington National Bank, 1405 Xenium Lane North (PCC180), Plymouth, MN 55441** | |

This Pay Proceeds, Pre-Delivery Acceptance and Payment Commencement Confirmation is given in connection with the above-referenced EFA and is hereby made a part of the EFA.  All capitalized terms used but not defined herein have the meanings assigned in the EFA.

Debtor irrevocably authorizes Creditor to disburse the Financed Amount under the EFA by paying the following vendor or vendors for the Collateral (each, a "Payee"). Debtor verifies that it has reviewed and approved the invoice(s) and/or order(s) referenced below. If the Amount set forth below is based on an Order or includes estimated taxes and the actual final invoiced amount from such Payee differs by 10% or less from the Amount set forth below, Debtor authorizes and requests that Creditor disburse the final invoiced amount due to such Payee and that the actual funded amount to all Payee(s) will be the Financed Amount under the EFA

| Payee | | Invoice/Order Number | Amount |
|---|---|---|---|
| LDC Medical | | 100% Early Commence | $55,045.00 |
| | Total | | $55,045.00 |

Debtor irrevocably agrees that, even though all or part of the Collateral may not have been delivered to Debtor, (i) Creditor may insert the date the above vendor(s) are paid as the Funding Date under the EFA and (ii) Debtor shall begin making its payments under the EFA based on such Funding Date.

Debtor warrants and agrees for the benefit of Creditor that (i) all of the Collateral has been or will be delivered to Debtor at the Collateral location set forth in the EFA within 60 days of the Funding Date (the "Specified Date"); (ii) Debtor is hereby irrevocably accepting the Collateral for all purposes under the EFA even though some or all of the Collateral has not yet been delivered to Debtor, (iii) the description of the Collateral set forth in the EFA is complete and correct, (iv) as of the date hereof, Debtor shall maintain the insurance required under the EFA on all Collateral even though some or all has not yet been delivered, and (v) there has been no adverse change in the business or financial condition of Debtor or any guarantor of the EFA since the day the credit application and, if applicable, most recent financial statements of Debtor and any guarantors were submitted to Creditor.  Debtor hereby agrees that if all Collateral is not delivered to Debtor by the Specified Date, Creditor may, at its option, declare an Event of Default under the EFA and the EFA is hereby amended to add such additional Event of Default. Upon Creditor's request, Debtor will verify (either verbally or in writing) that all Collateral has been delivered.

CREDITOR MAKES NO REPRESENTATION AS TO WHEN THE COLLATERAL WILL BE DELIVERED OR INSTALLED BY ANY VENDOR, NOR DOES CREDITOR MAKE ANY OTHER REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE COLLATERAL.  DEBTOR'S OBLIGATIONS UNDER THE EFA SHALL BE NON-CANCELABLE.  IF THE COLLATERAL IS NEVER DELIVERED OR INSTALLED, LOST IN TRANSIT, DESTROYED, DEFECTIVE OR IN ANY WAY DOES NOT SATISFY DEBTOR'S EXPECTATIONS, DEBTOR'S SOLE RECOURSE SHALL BE AGAINST THE VENDOR AND DEBTOR SHALL NOT HAVE ANY CLAIM OR DEFENSE TO ITS PAYMENT OBLIGATIONS OR ANY OTHER OBLIGATIONS UNDER THE EFA.

Except as specifically modified herein, all of the terms and conditions of the EFA shall remain in full force and effect and are hereby ratified and affirmed.

Date: ___February 16, 2022___

Debtor:   Midwest Heart and Vascular Associates, S.C.     By: _____     Dominic J. Tolitano, President



**Additional Information**
**Regarding Your Account and the Equipment**

| The "Contract": **Equipment Finance Agreement** ████████ dated **February 15, 2022** |
| --- |
| "Debtor" |
| **Midwest Heart and Vascular Associates, S.C., 236 East Irving Park Road, Wood Dale, IL  60191** |
| "Creditor" |
| **The Huntington National Bank, 1405 Xenium Lane North (PCC180), Plymouth, MN 55441** |

Equipment Description and Location:

| Description (including features) | Location |
| --- | --- |
| **Two (2) Biolitec E30 Watt 980nm Lasers, Serial #0101 and 0102 together with all attachments and accessories thereto** | **236 East Irving Park Road, Wood Dale, IL 60191** |

### ***PLEASE COMPLETE ALL SECTIONS BELOW ***

**Billing Address:  236 East Irving Park Road, Wood Dale, IL, 60191**
☐   The billing address stated above is correct.

☐   Change the billing address to the following address:_____

**Debtor Fax #:**  _____

**Debtor E-mail:**  _____

**Equipment Location and Vehicle Titling Location:**
☐   The Equipment will be located at the Equipment Location(s) stated above or on Exhibit A; provided that if any Equipment is motor vehicles, such vehicles will be titled in the titling office for the Equipment Location stated above or on Exhibit A.

☐   The Equipment will be located at: _____
   (If multiple locations, attach a list indicating by item of Equipment the City, State and County where such item will be located)
and the vehicles will be titled in: _____ (State) _____ (City)_____ (County)
   (If multiple vehicles titled in multiple states, attach a list indicating by VIN the State, City and County each vehicle will be titled)

**Tax Status (LEASE TRANSACTIONS ONLY):**

1.   **Sales/Use Tax:**  (check one)
  ☐   Subject to Sales and Use Tax.  (Tax will be based on the state where the vehicle is titled and where other Equipment is located).

  ☐   Exempt from sales and use tax, for the following reason: _____

  ☐   Exemption Certificate Attached

  ☐   Valid Exemption Certificate already on file with Creditor.
   ***If you are exempt from sales tax, you MUST provide exemption certificate or you will automatically be charged sales tax***

2.   **Heavy Vehicle Use Tax:**  Some vehicles are liable for Heavy Vehicle Use Tax, filed on Federal Form 2290. Creditor does not file this return.  If you determine the vehicle(s) is liable for this tax, you should include it on your own Form 2290.  Failure to report a taxable vehicle may prevent you from obtaining licenses or tabs.

**Acknowledged by:**
Debtor:   Midwest Heart and Vascular Associates, S.C.   By: _____   Dominic J. Tolitano, President

**DocuSign®**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: AE29AF33824C4688951345F5364F6B21 | | Status: Completed |
| Subject: Please DocuSign: Midwest Heart and Vascular Associates, S.C. Loan Documents.pdf | | |
| Source Envelope: | | |
| Document Pages: 13 | Signatures: 7 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | ELIZABETH DOUGHERTY |
| AutoNav: Enabled | | 1405 Xenium Lane N |
| EnvelopeId Stamping: Enabled | | Plymouth, MN 55441 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | ████████████████ |
| | | IP Address: ████████ |

### Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: ELIZABETH DOUGHERTY | Location: DocuSign |
| 2/15/2022 2:37:51 PM | ████████████████ | |

### Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Dominic J. Tolitano |  | Sent: 2/15/2022 2:44:38 PM |
| ████████████ | | Resent: 2/16/2022 8:42:12 AM |
| Security Level: Email, Account Authentication (None), Authentication | | Resent: 2/16/2022 8:42:21 AM |
| | | Viewed: 2/16/2022 9:44:44 AM |
| | Signature Adoption: Drawn on Device | Signed: 2/16/2022 10:04:31 AM |
| | Using IP Address: ████████ | |
| | Signed using mobile | |

**Authentication Details**
ID Check:
    Transaction: 31014423403987
    Result: passed
    Vendor ID: LexisNexis
    Type: iAuth
    Recipient Name Provided by: Recipient
    Information Provided for ID Check: Address, SSN9, SSN4, DOB
    Performed: 2/16/2022 9:44:38 AM

Question Details:
| | |
|---|---|
| passed | person.known.single.fake |
| passed | property.street.in.city.real |
| passed | vehicle.color.real |
| passed | person.city.real |
| passed | corporate.association.real |
| passed | property.county.real |

**Electronic Record and Signature Disclosure:**
    Accepted: 2/16/2022 9:44:44 AM
    ID: 6cd5bd2c-b7aa-435e-a1f4-9ec2be5756b0
    Company Name: The Huntington National Bank

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Natalie Tawil | **COPIED** | Sent: 2/15/2022 2:44:39 PM |
| ████████████ | | Viewed: 2/15/2022 2:46:07 PM |
| Security Level: Email, Account Authentication (None) | | |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Sargon Shamon<br>████████████<br>The Huntington National Bank - Lending<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | **COPIED** | Sent: 2/15/2022 2:44:39 PM<br>Viewed: 2/15/2022 2:47:11 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/15/2022 2:44:39 PM |
| Certified Delivered | Security Checked | 2/16/2022 9:44:44 AM |
| Signing Complete | Security Checked | 2/16/2022 10:04:31 AM |
| Completed | Security Checked | 2/16/2022 10:04:31 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Electronic Record and Signature Disclosure created on: 1/26/2022 10:49:13 AM
Parties agreed to: Dominic J. Tolitano

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, The Huntington National Bank (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact The Huntington National Bank:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: customerservice@financediv.com

**To advise The Huntington National Bank of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at customerservice@financediv.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from The Huntington National Bank**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to customerservice@financediv.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with The Huntington National Bank**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to customerservice@financediv.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify The Huntington National Bank as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by The Huntington National Bank during the course of your relationship with The Huntington National Bank.

EXHIBIT D

# Continuing Guaranty

Name of Obligor: **Midwest Heart and Vascular Associates, S.C.**

Name of Creditor: **The Huntington National Bank**

The undersigned ("Guarantor") hereby unconditionally and absolutely guarantees the full and prompt payment and performance when due (at maturity, by acceleration, or otherwise) of all payments, rents, debts, liabilities, and other obligations of every type and description of Obligor to Creditor, whether direct, indirect, absolute, contingent, secured, unsecured, primary, secondary, joint, several, joint and several, now existing or hereafter arising, acquired or owed (the "Obligations"). Guarantor agrees to pay Creditor, on demand, in immediately available funds: (a) the amount of each Obligation not paid when due, without any requirement that Creditor first attempt to collect any Obligations from Obligor or any other obligor therefor ("Co-obligor") or resort to any security for the Obligations ("Collateral") or other means of obtaining payment; and (b) all costs and expenses (including court costs and legal fees) incurred by Creditor in connection with the Obligations, this Guaranty and the enforcement of either, together with interest thereon from the time any amount becomes due until paid, at 18% per annum or, if less, the maximum rate permitted by applicable law. Should Guarantor die, sell or transfer all or substantially all Guarantor's non-exempt assets, have or seek to have a receiver appointed for Guarantor's assets, file or have filed against Guarantor a petition under the U. S. Bankruptcy Code, or any similar state or federal insolvency law, all Obligations will be immediately due and payable and Guarantor's obligations hereunder will automatically become immediately due and payable, without demand or notice of any kind. Guarantor's liability hereunder is unlimited and continuing. This Guaranty will remain in full force and effect even if all Obligations are paid in full, until Guarantor revokes this Guaranty prospectively as to future transactions by written notice actually received by Creditor. No revocation shall be effective as to Obligations existing or committed for at the time Creditor receives such notice, or any renewals, extensions or refinancings thereof. This Guaranty shall continue in effect or be reinstated if any amount received by Creditor for application to the Obligations is rescinded, recovered or returned for any reason (including in a bankruptcy proceeding), and the Obligations shall be deemed to have continued as though such amount had not been received. Creditor may require payments by Guarantor hereunder on one or more occasions.

Guarantor agrees that the Obligations will be paid and performed in accordance with their respective terms regardless of any applicable law, regulation or order affecting any of Creditor's rights with respect thereto, and regardless of enforceability of any Obligations against Obligor for any reason, including lack of legal existence, lack of authority, as a result of bankruptcy, insolvency or reorganization, or due to any defenses of Obligor. Guarantor waives presentment, demand, protest, notice of acceptance, notice of the creation or existence of any Obligations and all other notices of any kind, all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law, any right to require the marshaling of assets, and all defenses available to a surety, guarantor or accommodation co-obligor. Without limiting the foregoing, Guarantor's obligations shall not be released or affected by any act or omission, regardless of whether it may vary Guarantor's risk or otherwise would operate as a release or discharge of Guarantor, all of which may be done without notice to or the consent of Guarantor, including without limitation (i) any waiver, forbearance, or failure to enforce any right or remedy against Obligor, any Co-obligor or any Collateral; (ii) any extensions or renewals of any Obligation; (iii) any rescissions, amendments or modifications of any terms of any Obligation; (iv) the substitution or release of Obligor or any Co-obligor; (v) failure to obtain, perfect or preserve, any rights in or substitution, release, or loss of, any Collateral or other support for any Obligations; or (vi) the application or failure to apply in any particular manner any payments or credits. Guarantor will remain liable for any deficiency following any foreclosure of any Collateral regardless of any discharge given to Obligor. Until all Obligations have been satisfied, Guarantor (a) waives all rights of subrogation, contribution, indemnity and reimbursement against Obligor, any Co-obligor and any Collateral, and (b) will not attempt to collect any indebtedness of Obligor to Guarantor.

Guarantor is giving this Guaranty in good faith for adequate consideration and reasonably equivalent value, and without any intent to hinder, delay or defraud Guarantor's creditors. The execution, delivery and performance of this Guaranty do not and will not violate any provision of any indenture, agreement, instrument, law, rule, regulation or order to or by which Guarantor is a party or bound. Guarantor will provide Creditor on request Guarantor's most recent financial statements and other information, in such form as Creditor reasonably shall require. Guarantor will do all things and execute all documents as required by Creditor to give full effect to this Guaranty and to preserve Creditor's rights hereunder. Guarantor takes full responsibility for keeping informed of Obligor's financial condition and all other circumstances bearing on Guarantor's risk hereunder. Creditor shall have no duty to

advise Guarantor of information known to it regarding Obligor. Guarantor hereby consents to the use of electronic signatures on this Guaranty and any related document, and agrees that Guarantor's electronic signature shall be unconditionally valid and legally enforceable, and that Guarantor shall not contest the validity or enforceability of any electronic signature (or the authority of the signer to sign).

This Guaranty shall be binding on Guarantor, and Guarantor's heirs, representatives, successors and assigns, and shall inure to the benefit of Creditor, its successors and assigns. No assignment or transfer by Guarantor will relieve Guarantor of any liabilities or obligations hereunder. Creditor may, without notice to or consent of Guarantor, assign this Guaranty as it relates to any Obligation to a party who purchases or otherwise acquires all or part of any Obligation (an "Assignee"). Each Assignee shall have the right to enforce this Guaranty against Guarantor solely as it relates to the Obligation it acquired, and such enforcement may be brought separate and apart from actions by Creditor and/or other Assignees. **THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF MINNESOTA (EXCLUDING CONFLICTS LAWS). GUARANTOR AGREES THAT ANY SUIT TO ENFORCE THIS GUARANTY MAY BE BROUGHT IN FEDERAL OR STATE COURTS IN MINNESOTA, CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH COURT, AND CONSENTS TO SERVICE OF PROCESS BEING MADE ON GUARANTOR BY MAIL AT THE ADDRESS SPECIFIED HEREIN. GUARANTOR, AFTER CONSULTING (OR HAVING HAD AN OPPORTUNITY TO CONSULT) WITH COUNSEL OF GUARANTOR'S CHOICE, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY.** This Guaranty constitutes the entire agreement relating to the matters herein. No amendment or waiver of any provision hereof nor consent to any departure therefrom is effective unless in writing, signed by Creditor. No failure or delay by Creditor to exercise any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof. All of Creditor's rights and remedies are cumulative and not exclusive of any other remedies at law or by any other agreement. This Guaranty is in addition to, not in replacement of or substitution for, any other guaranty of the Obligations or any other guaranty of Guarantor held by Creditor. The invalidity or unenforceability of any provisions hereof will not affect the validity or enforceability of any other provisions. If more than one Guarantor has signed this Guaranty, each Guarantor shall be jointly and severally liable hereunder. This Guaranty and other documents may, in Creditor's sole discretion, be delivered by electronic transmission ("e-copy") and the e-copy of such document shall be admissible in any court or other proceeding as an original. Without limiting the foregoing, Guarantor will deliver to Creditor, promptly on request, the originally executed counterpart of this Guaranty; provided that neither delivery nor failure to deliver shall limit or modify the agreements set forth above.

GUARANTOR AGREES THAT CREDITOR MAY, IN ITS SOLE DISCRETION, FROM TIME TO TIME ENTER INTO ONE OR MORE LEASES, INTERIM FUNDINGS, LOANS OR OTHER FINANCIAL ACCOMMODATIONS WITH OR FOR THE BENEFIT OF OBLIGOR, WHETHER OR NOT NOW CONTEMPLATED, AND WHETHER OR NOT SECURED OR OTHERWISE GUARANTEED. THIS GUARANTY WILL COVER EACH AND EVERY PRESENT AND FUTURE OBLIGATION OF OBLIGOR TO CREDITOR, WHETHER OR NOT GUARANTOR RECEIVES NOTICE OF OR CONSENTS TO THE CREATION OR TERMS OF ANY SUCH OBLIGATIONS. ANY NOTICE OF OR REQUEST FOR CONSENT TO AN OBLIGATION ON ANY OCCASION WILL NOT ENTITLE GUARANTOR TO NOTICE OF OR THE RIGHT TO CONSENT TO OTHER OR FUTURE OBLIGATIONS.

Guarantor authorizes and consents to Creditor and its agents obtaining consumer credit reports and other financial and credit information, and making other credit inquiries about Guarantor, both in connection with Obligor's application and from time to time hereafter.

**Dated as of February 15, 2022**

| Guarantor: Dominic J Tolitano | By: | [signature: DJ Tolitano] | Dominic J Tolitano , An Individual |
|---|---|---|---|

**Guarantor's Address: 236 E Irving Park Road, Wood Dale, IL 60191**

# EXHIBIT E

# COMMERCIAL GUARANTY

| Borrower: | Midwest Heart & Vascular Associates, Inc.<br>236 E Irving Park Rd<br>Wood Dale, IL 60191 | Lender: | THE HUNTINGTON NATIONAL BANK<br>Chicago Commercial Lending<br>501 West North Avenue<br>Melrose Park, IL 60160 |
|---|---|---|---|
| Guarantor: | Dominic Tolitano<br>449 S Edgewood Ave<br>La Grange, IL 60525 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or financing transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be extended and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give

### COMMERCIAL GUARANTY
### (Continued)

notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**CONFESSION OF JUDGMENT.** Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Guarantor for the unpaid amount of this Guaranty as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Guaranty, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Guarantor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Guaranty have been paid in full. Guarantor hereby waives and releases any and all claims or causes of action which Guarantor might have against any attorney acting under the terms of authority which Guarantor has granted herein arising out of or connected with the confession of judgment hereunder.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.**

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of

**COMMERCIAL GUARANTY**
**(Continued)**

Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth, and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identifying documents for the entity or person.

**Jurisdiction.** Guarantor hereby submits to the jurisdiction of federal and state courts in the state referenced in the "Governing Law" paragraph of this Guaranty, and waives any objection to venue with respect to actions brought in such courts.

**THE FOLLOWING NOTICE IS REQUIRED BY ILLINOIS LAW:** Unless Guarantor provides Lender with evidence of the insurance coverage required by Guarantor's agreement with Lender, Lender may purchase insurance at Guarantor's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Guarantor's interests. The coverage that Lender purchases may not pay any claim that Guarantor makes or any claim that is made against Guarantor in connection with the collateral. Guarantor may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Guarantor has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Guarantor will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Guarantor's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Guarantor may be able to obtain on Guarantor's own.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Midwest Heart & Vascular Associates, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Dominic Tolitano, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means THE HUNTINGTON NATIONAL BANK, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 27, 2019.**

**GUARANTOR:**

X _____
Dominic Tolitano

# EXHIBIT F

# COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | Midwest Heart & Vascular Associates, Inc.<br>236 E Irving Park Rd<br>Wood Dale, IL 60191 | **Lender:** | THE HUNTINGTON NATIONAL BANK<br>Chicago Commercial Lending<br>501 West North Avenue<br>Melrose Park, IL 60160 |
| **Guarantor:** | Anthony Del Priore<br>1146 W Hubbard St Unit 2<br>Chicago, IL 60642 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give

**COMMERCIAL GUARANTY**
**(Continued)**

notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**CONFESSION OF JUDGMENT.** Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Guarantor for the unpaid amount of this Guaranty as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Guaranty, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Guarantor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Guaranty have been paid in full. Guarantor hereby waives and releases any and all claims or causes of action which Guarantor might have against any attorney acting under the terms of authority which Guarantor has granted herein arising out of or connected with the confession of judgment hereunder.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

    **Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

    **Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

    **Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

    **Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.**

    **Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

    **Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

    **Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of

# COMMERCIAL GUARANTY
## (Continued)

Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth, and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identifying documents for the entity or person.

**Jurisdiction.** Guarantor hereby submits to the jurisdiction of federal and state courts in the state referenced in the "Governing Law" paragraph of this Guaranty, and waives any objection to venue with respect to actions brought in such courts.

**THE FOLLOWING NOTICE IS REQUIRED BY ILLINOIS LAW:** Unless Guarantor provides Lender with evidence of the insurance coverage required by Guarantor's agreement with Lender, Lender may purchase insurance at Guarantor's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Guarantor's interests. The coverage that Lender purchases may not pay any claim that Guarantor makes or any claim that is made against Guarantor in connection with the collateral. Guarantor may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Guarantor has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Guarantor will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Guarantor's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Guarantor may be able to obtain on Guarantor's own.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Midwest Heart & Vascular Associates, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Anthony Del Priore, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means THE HUNTINGTON NATIONAL BANK, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 27, 2019.**

GUARANTOR:

X _____
Anthony Del Priore

# EXHIBIT G

# COMMERCIAL GUARANTY

| Borrower: | Midwest Heart & Vascular Associates, Inc.<br>236 E Irving Park Rd<br>Wood Dale, IL 60191 | Lender: | THE HUNTINGTON NATIONAL BANK<br>Chicago Commercial Lending<br>501 West North Avenue<br>Melrose Park, IL 60160 |
|---|---|---|---|
| Guarantor: | The Institute for Cardio Thoracic & Vein Surgery,<br>LLC<br>236 E Irving Park Rd<br>Wood Dale, IL 60191 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty.** This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor;

# COMMERCIAL GUARANTY
## (Continued)

(D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**CONFESSION OF JUDGMENT.** Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Guarantor for the unpaid amount of this Guaranty as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Guaranty, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Guarantor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Guaranty have been paid in full. Guarantor hereby waives and releases any and all claims or causes of action which Guarantor might have against any attorney acting under the terms of authority which Guarantor has granted herein arising out of or connected with the confession of judgment hereunder.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.**

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the

# COMMERCIAL GUARANTY
## (Continued)

purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**IMPORTANT INFORMATION ABOUT PROCEDURES REQUIRED BY THE USA PATRIOT ACT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with the Lender.

What this means: When an entity or person opens an account or establishes a relationship with the Lender, the Lender may ask for the name, address, date of birth, and other information that will allow the Lender to identify the entity or person who opens an account or establishes a relationship with the Lender. The Lender may also ask to see identifying documents for the entity or person.

**Jurisdiction.** Guarantor hereby submits to the jurisdiction of federal and state courts in the state referenced in the "Governing Law" paragraph of this Guaranty, and waives any objection to venue with respect to actions brought in such courts.

**THE FOLLOWING NOTICE IS REQUIRED BY ILLINOIS LAW:** Unless Guarantor provides Lender with evidence of the insurance coverage required by Guarantor's agreement with Lender, Lender may purchase insurance at Guarantor's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Guarantor's interests. The coverage that Lender purchases may not pay any claim that Guarantor makes or any claim that is made against Guarantor in connection with the collateral. Guarantor may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Guarantor has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Guarantor will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Guarantor's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Guarantor may be able to obtain on Guarantor's own.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Midwest Heart & Vascular Associates, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation The Institute for Cardio Thoracic & Vein Surgery, LLC, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means THE HUNTINGTON NATIONAL BANK, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 27, 2019.

GUARANTOR:

THE INSTITUTE FOR CARDIO THORACIC & VEIN SURGERY, LLC

By: _____
Dominic Tolitano, Member of The Institute for
Cardio Thoracic & Vein Surgery, LLC